NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-2810-13T2

IN THE MATTER OF THE NEW
JERSEY FIREMEN'S ASSOCIATION
OBLIGATION TO PROVIDE RELIEF
APPLICATIONS UNDER THE OPEN
PUBLIC RECORDS ACT

_____

JEFF CARTER,

      Third-Party
      Plaintiff-Appellant,

v.

JOHN DOE,

      Third-Party Defendant.

_____

| APPROVED FOR PUBLICATION |
| :---: |
| December 18, 2015 |
| APPELLATE DIVISION |

Argued June 2, 2015 – Decided December 18, 2015

Before Judges Messano, Ostrer and Tassini.

On appeal from the Superior Court of New Jersey, Law Division, Union County, Docket No. L-2932-13.

Jeff Carter, appellant pro se.

John C. Gillespie argued the cause for respondent New Jersey State Firemen's Association (Parker McCay P.A., attorneys; George M. Morris, of counsel; Stacy L. Moore, Jr., on the brief).

Thomas J. Cafferty argued the cause for amicus curiae New Jersey Press Association (Gibbons P.C., attorneys; Mr. Cafferty, of

counsel and on the brief; Nomi I. Lowy and Lauren E. James-Weir, on the brief).

The opinion of the court was delivered by

OSTRER, J.A.D.

This appeal involves the Open Public Records Act (OPRA), N.J.S.A. 47:1A-1 to -13, the Declaratory Judgment Act (DJA), N.J.S.A. 2A:16-50 to -62, and records of the New Jersey State Firemen's Association (Association), a public agency under OPRA. See N.J.S.A. 47:1A-1.1. We must resolve two principal issues affecting the public's right to access government records.

First, we must decide, as a procedural matter, whether a government records custodian — in this case, the Association — may bring an action pursuant to the DJA to secure a declaratory judgment that it properly denied access to a record under OPRA and the common law right of access. With respect to OPRA, we conclude that a records custodian may not bring a declaratory judgment action against a record requestor to enforce its right to withhold records, because OPRA does not provide the records custodian an independent right of action. As to both OPRA and the common law, declaratory relief was inappropriate in this case because the declaratory judgment action was essentially an effort to preempt an imminent claim by the records requestor; and allowing a declaratory judgment action solely with respect to the common law would unnecessarily fragment claims.

2                                                    A-2810-13T2

Second, we are asked to determine, as a substantive matter, whether the requestor in this case, under OPRA or the common law, has a right to access records pertaining to a relief award made by the Association. We conclude that both OPRA and the common law require disclosure of documents containing the name of the applicant and the amount of the award.

I.

This dispute arose out of the records request of defendant Jeff Carter.[1] On July 15, 2013, Carter electronically filed a request, under OPRA and the common law, for records pertaining to an application for relief by John Doe,[2] a man associated with the Millstone Valley Fire Department. Carter sought the following documents:

> 1. Copies of record(s) (including attachments) <u>submitted by</u> [John Doe], Local 501 agent(s), and/or NJSFA agent(s) <u>seeking</u> financial benefits described in the "BACKGROUND" section above from January 1, 2008 through July 15, 2013.

---

[1] The Association improperly captioned its verified complaint for declaratory judgment against Jeff Carter as "In the Matter of the New Jersey State Firemen's Association Obligation to Provide Relief Applications Under the Open Public Records Act." See R. 1:4-1 (stating that the title of a complaint shall include the names of all parties).

[2] Although the records request identified the person by name, the name is redacted in the public record on appeal.

2. Copies of record(s) (including attachments) <u>sent to</u> [John Doe], Local 501 agent(s), and/or NJSFA agent(s) <u>disbursing</u> financial benefits described in the "BACKGROUND" section above from January 1, 2008 through July 15, 2013.

3. If no record(s) are responsive to Items No. 1 or 2 above, then copies of the <u>front</u> and <u>back</u> of every check providing relief and/or similar benefits, both State and Local, paid to [John Doe] between January 1, 2008 through July 15, 2013. (Note that checks are <u>not</u> required <u>if</u> responsive records are provided for Items No. 1 <u>and</u> 2 above.)

Association vice president Fred Gunson denied Carter's request in a July 22, 2013 email. Gunson stated that applicants for relief through a local firemen's relief association or the Association "have a reasonable expectation of privacy"; release would constitute an "unwarranted invasion" of those rights; and "[a]ccordingly, the New Jersey State Firemen's Association cannot release those documents."

On August 3, 2013, Carter responded that he did "not seek any legitimately defined privileged or exempt information," but he insisted that "certain records regarding financial matters (e.g., payroll records) <u>must</u> be provided with appropriate redactions." He asked for an index of any withheld or redacted documents, with explanations. Carter also stated, "Because I was unable to respond sooner, I understand that the timeframe

for my original request will <u>resume</u> on the next business day (i.e. August 5, 2013)."

Carter included an additional document request. He sought "a copy of the policy and/or procedures governing how 'relief' applications/requests are processed by the State and local associations."

On August 15, 2013, the Association filed its verified complaint for declaratory judgment, along with a proposed order to show cause, to compel Carter to show cause why the final relief sought in the verified complaint should not be entered. Although served only upon Carter, the Association sought an order:

> a. Declaring that individual relief applications are of such a private nature that the New Jersey State Firemen's Association or the local relief association shall be prevented from acknowledging the existence of individual applications and prohibited from releasing the same under . . . the Open Public Records Act;
>
> b. Declaring that a Requestor, in order to determine whether the New Jersey State Firemen's Association or the local relief association is performing its duties appropriately, may request a series or date range of applications, but said applications may only be released upon the redaction of all personal information including the requestors' names, addresses, account numbers.

The Association sought identical relief with respect to the common law right of access.

The Association argued that under OPRA the information Carter requested should not be subject to disclosure under OPRA because it would violate an applicant's reasonable expectation of privacy under N.J.S.A. 47:1A-1. The Association asserted that upon applying the factors in Doe v. Poritz, 142 N.J. 1, 88 (1995), disclosure of applicant-specific documents should be denied.

The Association disclosed documents entitled "Rules and Guidelines Governing Relief Form 101"; "Instruction for Investigation of Relief Applicants by Local Relief Boards"; "Application for Local Relief [-] New Jersey State Firemen's Association"; and "Instructions for the Board of Trustees and Board of Representatives for Review of Relief Application." Although there is no competent evidence before us authenticating or explaining the documents, we assume for the sake of the appeal that the Association uses these documents when reviewing applications for relief.[3]

---

[3] The documents were attached as exhibits to the Association's brief, contrary to R. 1:6-6. See Pressler & Verniero, Current N.J. Court Rules, comment 1 on R. 1:6-6 (2015); Sellers v. Schonfeld, 270 N.J. Super. 424, 427 (1993) ("[O]nly [an] affidavit together with properly certified depositions, answers
(continued)

The application forms generally require the submission of detailed personal financial information, and a personal statement of the applicant, to demonstrate the need for financial assistance from a local association or the Association. The "Rules and Guidelines" document, and the respective instructions to the apparent decision-makers, do not include detailed criteria for determining whether to award relief and for what amount. The "Rules and Guidelines" document describes the information applicants must submit. It states, "Relief Assistance is <u>not automatic</u> and will only be considered on merit, documentation and determination by the local association." The instructions to the local relief boards state:

> The intended use of this form, is to provide the respective boards with information pertaining to the applicant's request for supplementary financial assistance, and in determining the "NEED."

> <u>WHAT IS "NEED"</u>

> "NEED" IS: Imperative Demand ***** Time of great difficulty ***** Crisis ***** Urgency

> "NEED" is a state of circumstances requiring something!

---

(continued)
to interrogatories, or admissions can supply facts outside the record that are not judicially noticeable.").

A-2810-13T2

> It is important to remember, while a financial loss may be shown, there may not be the "NEED." "NEED" and financial loss do not necessarily go hand in hand. (Example: The person may have a financial loss, but have financial means and can afford to cover the financial loss without the use of local relief, thus no "NEED" would then exist.

Apparently, there are other rules or regulations not in the record before us, as the "Rules and Guidelines" document includes a paragraph authorizing and consenting to the release of financial documents to the local association and the Association "for the purpose of determining eligibility for relief benefits . . . in accordance with the requirements of N.J.S.A. 43:17-24 and Article VII of the General Relief Fund Rules." (emphasis added).

The documents indicate that the application process is intended to be confidential. The instructions to local relief boards include the statement: "All information given must be held in strict confidence." The Rules and Guidelines Document states, "The New Jersey State Firemen's Association is required to protect the confidentiality of information. All Officers are required to comply with our policies."

The trial court entered the order to show cause, required Carter to file a response to the order by September 16, 2013, and set a return date of September 27, 2013. The order also

advised Carter that he was required to answer the verified complaint within thirty-five days.

Carter retained counsel and timely filed a verified answer and counterclaim, a third-party complaint against John Doe, and a letter brief in opposition to the Association's application for declaratory relief. Carter narrowed his document request, stating he only sought disclosure of the checks paid to John Doe and did not seek the applications Doe may have filed. He argued he was entitled to the checks under both OPRA and the common law. He sought dismissal of the Association's verified complaint and an award of attorney's fees.

In a supporting certification, Carter asserted that John Doe served as an elected fire commissioner and volunteer firefighter in Franklin Township. Carter stated that Doe was also a full-time municipal employee.[4] Carter alleged that John Doe was found to have viewed pornographic images on a fire district computer. Although criminal charges were filed, a grand jury returned a no-bill, according to Carter. However, Doe was later discharged from his public employment for conduct unbecoming of a township employee. Carter attached newspaper articles to support his assertions. Carter also discussed a

---

[4] Carter apparently served as elected fire commissioner from 1987 through 1997.

suit, filed by his sister and later settled, alleging a violation of the Law Against Discrimination by the fire district and Doe. Carter maintained that there was a public interest in learning whether a person who was discharged under the circumstances Carter described had received financial assistance through the Association. He disputed the Association's claim that Doe in particular had an expectation of privacy, given past publicity.

In a responsive certification, Gunson explained that members are often eligible for financial assistance from local associations; and if this assistance "is not adequate to address that member's needs, the member can then approach the . . . Association, which can award up[] to three (3) times the amount of the local contribution." Gunson did not disclose the criteria utilized for the financial assistance decisions, nor did he disclose the rules or regulations governing the decision process. However, he stated that the Association and local associations have specific procedures to treat members' applications anonymously, eliminating the possibility of discrimination in responding to the request for financial relief. These procedures include converting the applicant's name to a control number.

In its answer to Carter's counterclaim, the Association asserted, among other defenses, that Carter's counterclaim was time-barred as it was filed more than forty-five days after the Association's denial of his document request.

The trial court heard argument on the return date in September 2013. The court also reviewed in camera Doe's application for assistance, which apparently had been submitted to the court in August, but was later sealed.

In an order filed January 15, 2014, the court denied Carter's requests for dismissal of the verified complaint, disclosure of the checks paid to Doe, and attorney's fees. The court did not enter a separate order granting declaratory relief to the Association. However, in an accompanying letter opinion, the court found that the names of relief recipients, the amounts paid through the Association's financial assistance programs, and their applications need not be released.

The court addressed the subject of applications, notwithstanding that Carter had limited his request to checks paid to John Doe and expressly stated he was not seeking information in the relief applications. The court applied the seven factors outlined in Doe, supra:

> (1) the type of record requested; (2) the information it does or might contain; (3) the potential for harm in any subsequent nonconsensual disclosure; (4) the injury

from disclosure to the relationship in which the record was generated; (5) the adequacy of safeguards to prevent unauthorized disclosure; (6) the degree of need for access; and (7) whether there is an express statutory mandate, articulated public policy, or other recognized public interest militating toward access.

[142 N.J. at 88 (internal quotation marks and citation omitted).]

Based on that analysis, the court held that OPRA's privacy clause, N.J.S.A. 47:1A-1, barred release:

Applying the Doe factors to the present case, the application is a public record as a document kept, made or maintained in the course of official business of the Association. The second factor weighs in favor of non-disclosure because the information is an individual's complete and personal financial history, including but not limited to tax returns, credit card bills, mortgage payments and, hospital bills. Applying the third factor, revealing this information has the potential to lead to great harm created by the release of said information because it has the potential to lead to identity theft and public embarrassment. Defendant's argument that John Doe has already sustained great public embarrassment is not without merit being that the incident for which he was fired was disclosed in the newspaper. A significant harm exists if individual relief applications are released. Applying the fourth factor, the release of the information may cause an applicant to hesitate before [he or she] seeks assistance and may chill the disclosure of critical information regarding the need for assistance for fear that the knowledge will be subject to public scrutiny. The fifth factor, speaks to the adequacy of safeguards

12

to prevent disclosure. The Association has established a system to convert the individual's name into a unique identification number for each applicant to ensure the confidentiality of the information and to protect the interests of the applicant. While the Association has not directed this Court towards a statute mandating non-disclosure the seventh factor weighs in favor of non-disclosure because there is no policy or statute which mandates access.

Citing Loigman v. Kimmelman, 102 N.J. 98, 113 (1986), the trial court concluded that the common law did not require disclosure.

This appeal followed. Carter now represents himself pro se. He renews his argument that the Association should not have been permitted to seek a declaratory judgment. Although he limited his request before the trial court to the checks paid to John Doe, he now renews his request for John Doe's applications, redacted as appropriate. We subsequently granted permission to the New Jersey Press Association (NJPA) to appear as amicus curiae. NJPA participates solely to argue that a records custodian may not seek a declaratory judgment under OPRA.

## II.

We turn first to defendant's argument that the Association was not entitled to seek a declaratory judgment confirming its denial of access under both OPRA and the common law right of

access. We begin with an overview of the law on declaratory judgments.

## A.

The DJA is based on the 1922 Uniform Declaratory Judgments Act. 12 U.L.A. 331 (2008). The DJA provides that "a person . . . whose rights, status, or other legal relations are affected by a statute . . . may have determined any question of construction or validity arising under the . . . statute . . . and obtain a declaration of rights, status, or other legal relations thereunder." N.J.S.A. 2A:16-53. See Williams v. Borough of Clayton, ___ N.J. Super. ___, ___ (App. Div. 2015) (slip op. at 10-11) (approving resort to declaratory relief regarding interpretation of N.J.S.A. 40A:14-129 and -130). The purpose of the Act "is to settle and afford relief from uncertainty and insecurity with respect to rights, status and other legal relations." N.J.S.A. 2A:16-51; N.J. Ass'n for Retarded Citizens v. N.J. Dep't of Human Servs., 89 N.J. 234, 242 (1982) ("[The purpose of the Act] is to end uncertainty about the legal rights and duties of the parties to litigation in controversies which have not yet reached the stage at which the parties seek a coercive remedy.")

The DJA constitutes "remedial legislation entitled to liberal construction and administration." N.J. Ass'n for

Retarded Citizens, supra, 89 N.J. at 241-42; N.J.S.A. 2A:16-51. The DJA must be "interpreted and construed as to effectuate its general purpose to make uniform the law of those states which enact it, and to harmonize, as far as possible, with federal laws, rules and regulations on the subject of declaratory judgments." N.J.S.A. 2A:16-51.

The decision to grant or deny declaratory relief lies within the court's discretion. See In re Resolution of State Comm. of Investigation, 108 N.J. 35, 46 (1987); see also State v. Eatontown Borough, 366 N.J. Super. 626, 637 (App. Div. 2004) ("Generally, it rests in the sound discretion of the trial court whether declaratory relief under the Act should be granted."). "Declaratory relief is not to be denied simply because other relief is available." Nat'l — Ben Franklin Fire Ins. Co. v. Camden Trust Co., 21 N.J. 16, 22 (1956); see also R. 4:42-3 ("A judgment for declaratory relief, if appropriate, is not precluded by the existence of another appropriate remedy.").

On the other hand, "a court might in the proper exercise of its discretion, deny such [declaratory] relief if it satisfactorily appeared that the other relief would be more effective." Nat'l — Ben Franklin Fire Ins. Co., supra, 21 N.J. at 22. For example, a court may decline to award relief "where only fragmentary redress will be awarded . . . ." Utility Blade

& Razor Co. v. Donovan, 33 N.J. Super. 566, 572 (App. Div. 1955). "The court may refuse to render or enter a declaratory judgment, when, if rendered or entered, it would not terminate the uncertainty or controversy giving rise to the proceeding." N.J.S.A. 2A:16-61; see also Nat'l — Ben Franklin Fire Ins. Co., supra, 21 N.J. at 23. A court may also decline to render a declaratory judgment if "convinced that the public interest and an enlightened use of the judicial function" require restraint. The Proprietary Ass'n v. Bd. of Pharmacy, 16 N.J. 62, 71 (1954).

The right to relief under the DJA is procedural in nature; it does not create substantive rights to relief. "A declaratory judgment act merely provides a procedural device to accelerate the resolution of a dispute; the procedural right does not alter the substance of the dispute." Ciba-Geigy Corp. v. Liberty Mut. Ins. Co., 149 N.J. 278, 302 (1997) (O'Hern, J., dissenting); see Labor Ready Northeast, Inc. v. Director, Div. of Taxation, 25 N.J. Tax 607, 621 (2011). The United States Supreme Court has adopted a similar view of the federal Declaratory Judgment Act, 26 U.S.C.A. § 2201. See Schilling v. Rogers, 363 U.S. 666, 677, 80 S. Ct. 1288, 1296, 4 L. Ed. 2d 1478, 1485-86 (1960) (stating that the availability of relief under the federal Declaratory Judgment Act, 28 U.S.C.A. § 2201, "presupposes the existence of a judicially remediable right"); Skelly Oil Co. v. Phillips

Petroleum Co., 339 U.S. 667, 671, 70 S. Ct. 876, 879, 94 L. Ed. 1194, 1199 (1950) ("The operation of the Declaratory Judgment Act is procedural only. Congress enlarged the range of remedies available in the federal courts but did not extend their jurisdiction.") (citation omitted).

Put another way, if there is no private right of action under a particular statute, a party may not secure a declaration of its statutory rights by seeking relief under the DJA. This general principle is implied by the Court's decision in In re Resolution of State Comm. of Investigation, supra, 108 N.J. at 46. The Court declined to render a declaratory judgment on the question whether the State Commission on Investigation (SCI) unlawfully disclosed information about the plaintiffs. The Court held that plaintiffs lacked a private right of action to secure injunctive relief against the SCI arising out of the alleged disclosures. Ibid. ("[O]ur decision that the plaintiffs may not obtain the injunctive relief they sought undermines their need for a declaratory judgment."); see also In re A.N., 430 N.J. Super. 235, 244-45 (App. Div. 2013) (holding that the Chancery Division lacked jurisdiction under N.J.S.A. 2A:16-55 to determine Medicaid eligibility, where the authority to do so was vested in the Division of Medical Assistance and Health Services); Med. Soc. of N.J. v. AmeriHealth HMO, Inc., 376 N.J.

Super. 48, 59 (App. Div. 2005) (denying Medical Society's claim for declaratory and injunctive relief under L. 1989, c. 154, as it lacked a private right of action).[5]

Courts in other jurisdictions applying comparable provisions of their declaratory judgment acts have clearly stated the principle that declaratory relief is unavailable when there is no private right of action. See Pono v. Molokai Ranch, Ltd., 194 P.3d 1126, 1148 (Haw. Ct. App. 2008) ("[I]n order for a private citizen to seek a declaratory judgment that a statute has been violated, the private citizen must, as a threshold matter, have a private right of action to enforce the statute."), certif. denied, 208 Haw. LEXIS 304 (2008); Gore v. Indiana Ins. Co., 876 N.E.2d 156, 165-66 (Ill. App. Ct. 2007) (finding plaintiff lacked standing to bring declaratory judgment action because statute at issue did not confer private right of action); Nichols v. Kansas PAC, 11 P.3d 1134, 1146-47 (Kan. 2000) (refusing to grant declaratory relief under consumer fraud

---

[5] Bergen Cty. Improvement Auth. v. N. Jersey Media Group, Inc., 370 N.J. Super. 504 (App. Div. 2004), cited by the Association, does not support the contrary view. Although the plaintiff in that case sought declaratory relief, the court did not address the issue of the plaintiff's right to do so. In Chamber of Commerce v. State, 89 N.J. 131 (1982), and N.L. Industries, Inc., v. New Jersey Department of Environmental Protection, 397 N.J. Super. 127 (App. Div. 2007), certif. denied, 195 N.J. 418 (2008), cited in the concurring opinion, infra, the parties did not raise, nor did the court address, the plaintiff's right of action, express or implied, under the statute at issue.

statute because it contained no private right of action); Alliance for Metro. Stability v. Metro. Council, 671 N.W.2d 905, 916 (Minn. Ct. App. 2003) (stating that where "there was no private right to enforce" the statute, the "Uniform Declaratory Judgments Act cannot create a cause of action that does not otherwise exist"); Delgado v. N.Y.C. Hous. Auth., 888 N.Y.S.2d 19, 21 (App. Div. 2009) (holding that petitioners did not possess "a private right of action for injunctive and declaratory relief sought" because only the city's housing official could enforce the city's housing maintenance code). See also Boston Med. Ctr. v. Sec'y of the Exec. Office of HHS, 974 N.E.2d 1114, 1134 (Mass. 2012) (where "the Legislature has declined to give the plaintiff providers any private right of action and what is at issue is the reasonableness . . . and the methodology" of payment rates, "[a] declaratory judgment cannot be used to circumvent a legislative judgment denying a provider the opportunity to seek administrative or judicial review of the reasonableness of payment rates.").[6]

---

[6] Cf. Serv. Emp. Int'l. Union, Local 509 v. Dep't of Mental Health, 14 N.E.3d 216, 227 (Mass. 2014) (citing Boston Med. Ctr., supra, 974 N.E.2d at 1134) (confirming principle that declaratory relief shall be denied in the absence of a private right of action where Legislature intended to "foreclose certain remedies," but awarding declaratory relief where a party "suffered a cognizable injury," lacked other means to assure agency's compliance with statute, "[n]o other party [was] (continued)

Federal courts applying the federal Declaratory Judgment Act, 28 U.S.C.A. § 2201, likewise have determined that the federal act does not provide a right to declaratory relief where no private right of action exists. See, e.g., Mylan Pharm., Inc. v. Thompson, 268 F.3d 1323, 1332 (Fed. Cir. 2001) (barring declaratory relief because the Federal Food, Drug, and Cosmetic Act did not provide plaintiff a private cause of action), cert. denied, 537 U.S. 941, 123 S. Ct. 340, 154 L. Ed. 2d 248 (2002); Dallas Cty. v. MERSCORP, Inc., 2 F. Supp. 3d 938, 947 (N.D.Tex. 2014) ("[A] plaintiff may not obtain a declaratory judgment under a statute . . . that provides no private right of action."); Reid v. Aransas Cty., 805 F. Supp. 2d 322, 339 (S.D.Tex. 2011) (noting that because the federal act does not create a substantive cause of action, but can only be invoked to address a controversy arising under other substantive law, plaintiff could not seek relief to which he would otherwise not be entitled); Jones v. Hobbs, 745 F. Supp. 2d 886, 893 (E.D.Ark. 2010) ("[T]he Declaratory Judgment Act does not authorize actions to decide whether federal statutes have been or will be violated when no private right of action to enforce the statutes

(continued)
entitled to challenge the alleged violation," and denial of declaratory relief would "contravene the Legislature's intent.").

has been created by Congress."); <u>Glen v. Club Mediterranee S.A.</u>, 365 <u>F. Supp.</u> 2d 1263 (S.D.Fla. 2005) ("[J]udicial review is unavailable where no express provision for judicial relief exists . . . . For this Court to create a private right of action for declaratory relief [where none exists] would be contrary to legislative intent."), <u>aff'd</u>, 450 <u>F.</u>3d 1251 (11th Cir. 2006). We construe our DJA in harmony with the foregoing state and federal decisions. <u>See</u> <u>N.J.S.A.</u> 2A:16-51.

As the federal court in <u>Jones</u> observed, where enforcement of a law is vested solely in the executive branch, allowing declaratory relief "would circumvent the discretion entrusted to the executive branch in deciding how and when to enforce those statutes." <u>Jones</u>, <u>supra</u>, 745 <u>F. Supp.</u> 2d at 893. Likewise, where no private right of action exists, allowing parties to obtain declaratory relief would "evade the intent of Congress not to create private rights of action." <u>Ibid.</u>

A related principle of the law of declaratory judgments is that "where a special <u>statutory</u> procedure has been provided as an exclusive remedy for a particular type of case in hand . . . that specific recourse must be followed," to the exclusion of declaratory relief. Edwin Borchard, <u>Declaratory Judgments</u> (2d ed. 1941) at 342. "So, when the statute provides that an appeal from an administrative determination may be taken only in a

certain way and to a certain court . . . it would have been wrong for another court . . . to interfere and entertain a suit for a declaration . . . ." Id. at 343-44.

We adopt the same reasoning here. To do otherwise would allow records custodians to evade the Legislature's intent with respect to enforcement of rights under OPRA, which we discuss below. We recognize that the phrase "private right of action" may appear to be a misnomer when used to define the rights of the Association, which is a public agency under OPRA. Yet, the governing principle is the same. A party that lacks a statutory right of action under OPRA may not obtain declaratory relief regarding its rights or obligations under OPRA.

### B.

We conclude that OPRA does not vest a right of action in a records custodian. Consequently, a records custodian has no right to declaratory relief. Put another way, the Legislature intended that only requestors may seek review of OPRA decisions, by resort to the Government Records Council (GRC) or the court. N.J.S.A. 47:1A-6.

OPRA expressly grants a right of action exclusively to requestors. A requestor may elect to bring an action in Superior Court, or before the GRC, to challenge a denial of access:

> A person who is denied access to a government record by the custodian of the record, at the option of the requestor, may:
>
> institute a proceeding to challenge the custodian's decision by filing an action in Superior Court which shall be heard in the vicinage where it is filed by a Superior Court Judge who has been designated to hear such cases because of that judge's knowledge and expertise in matters relating to access to government records; or
>
> in lieu of filing an action in Superior Court, file a complaint with the Government Records Council established pursuant to section 8 of P.L. 2001, c. 404 (C. 47:1A-7).
>
> The right to institute any proceeding under this section shall be solely that of the requestor. Any such proceeding shall proceed in a summary or expedited manner. The public agency shall have the burden of proving that the denial of access is authorized by law. If it is determined that access has been improperly denied, the court or agency head shall order that access be allowed. A requestor who prevails in any proceeding shall be entitled to a reasonable attorney's fee.
>
> [N.J.S.A. 47:1A-6 (emphasis added).]

Even assuming for argument's sake that N.J.S.A. 47:1A-6 does not grant a right of action exclusively to a requestor,[7] any other party's right of action would have to be inferred, given the absence of an explicit grant. However, our courts

---

[7] The Association argues that the right "solely" granted the requestor is the right to commence "proceedings under this section," which the Association contends is limited to challenges by a requestor denied access.

"have been reluctant to infer a statutory private right of action where the Legislature has not expressly provided for such action."  R.J. Gaydos Ins. Agency, Inc. v. Nat'l Consumer Ins. Co., 168 N.J. 255, 271 (2001).  The Court has adopted a three-part test for determining whether a statute implies a private right of action:

> To determine if a statute confers an implied private right of action, courts consider whether: (1) plaintiff is a member of the class for whose special benefit the statute was enacted; (2) there is any evidence that the Legislature intended to create a private right of action under the statute; and (3) it is consistent with the underlying purposes of the legislative scheme to infer the existence of such a remedy.
>
> [Id. at 272.]

A court's primary mission is to determine legislative intent. Id. at 272-73.

Applying this test, we conclude the Legislature did not intend for records custodians to bring actions against record requestors to enforce their asserted right to withhold records. OPRA was enacted to promote the public's right of access to government records, and to enable the public to monitor the activities of government.  See, e.g., Educ. Law Ctr. v. N.J. Dep't of Educ., 198 N.J. 274, 284 (2009) ("OPRA's clear purpose . . . is 'to maximize public knowledge about public affairs in order to ensure an informed citizenry and to minimize the evils

24

inherent in a secluded process.'") (quoting Mason v. City of Hoboken, 196 N.J. 51, 64 (2008)). Having reviewed OPRA's legislative history, we find no evidence of legislative intent to grant a right of action to records custodians. OPRA provides a broad right of access to government records. The statute "shall be construed in favor of the public's right of access." N.J.S.A. 47:1A-1.

Recognizing such a right of action would be contrary to legislative design. A right of action would enable records custodians to hale into court requestors who have no interest in pursuing any review of a records custodian's denial, subjecting requestors to the emotional turmoil and burdens attendant to being sued. Such a right of action would also undermine requestors' express right under OPRA to choose whether to challenge the denial of access before the GRC or in court, by empowering records custodians to choose the forum. Just the threat of suit may deter some citizens from exercising their rights under OPRA.

C.

Although the foregoing analysis does not address the right to declaratory relief regarding the Association's obligations under the common law right of access, we conclude that such

25                                                    A-2810-13T2

relief would have been inappropriate in this case. We do so for two reasons.

First, the Association's evident intent was to preempt an action by Carter. We long ago held that judicial discretion to grant relief under the declaratory judgment statute should be withheld from a party whose clear purpose was "to have the court adjudicate in advance the validity of its possible defense to defendants' imminent law suit." Rego Indus., Inc. v. Am. Modern Metals Corp., 91 N.J. Super. 447, 453 (App. Div. 1966); see also Donadio v. Cunningham, 58 N.J. 309, 325 (1971) (stating that "relief by way of a declaratory judgment should be withheld, when the request is in effect an attempt to have the court adjudicate in advance the validity of a possible defense in some expected future law suit"); Utility Blade & Razor, supra, 31 N.J. Super. at 572-73 ("In the usual case where an action by one party is imminent, it would serve no sensible purpose to permit his adversary to sue first for a declaration that he has a good defense to the action.").[8]

_____

[8] We recognize that where a lawsuit is not imminent, but the parties' rights and responsibilities in an ongoing relationship are subject to uncertainty, declaratory relief may be appropriate, as was found in Utility Blade & Razor, supra, 33 N.J. Super. at 573 ("On the other hand, under some circumstances, if the suit is not imminent and the declaratory proceeding will relieve a party of a burden and would seem -- in any event, through the interposition of a counterclaim -- to

(continued)

Second, allowing a declaratory judgment action to proceed to clarify duties under the common law right of access, when relief under OPRA is precluded, would result in "fragmentary redress." Id. at 571. As noted above, a court is empowered to refuse declaratory relief when it "would not terminate the uncertainty or controversy giving rise to the proceeding." N.J.S.A. 2A:16-61.[9]

In sum, we conclude that the court erred in granting the Association declaratory relief.

### III.

We turn to the issue whether Carter was entitled under OPRA to obtain access to records of relief payments to John Doe.[10]

_____

(continued)
settle the entire controversy, it may be unjust not to permit him to sue immediately to free himself of liability.").

[9] We also note that the Association's request for declaratory relief, and the court's declaration, were overly broad. The relief sought and granted pertained not just to Carter, but any prospective requestor of relief applications and payments. Yet, only Carter was named and served. "When declaratory relief is sought, all persons having . . . any interest which would be affected by the declaration shall be made parties to the proceeding." N.J.S.A. 2A:16-56. "The court cannot adjudicate the rights of parties who are not before the court." Gotlib v. Gotlib, 399 N.J. Super. 295, 313 (App. Div. 2008).

[10] We decline to address Carter's additional requests because he abandoned those in his brief to the trial court. "[O]ur appellate courts will decline to consider questions or issues not properly presented to the trial court when an opportunity for such a presentation is available 'unless the questions so
(continued)

Before doing so, we review briefly the role of the Association and local relief associations.

A.

We have previously discussed at some length the history of the Association, the local relief associations, and their statutory authority to grant relief payments and burial benefits to their members and members' families.  Paff v. N.J. State Firemen's Ass'n, 431 N.J. Super. 278 (App. Div. 2013).  Among their purposes, local relief associations shall

> maintain a fund for the relief, support or burial of:
>
> (1) needy firefighters and their families;
>
> (2) any persons and the families of any persons who are injured or die in the course of doing public fire duty, or who may become needy or disabled or die as the result of doing such duty or be prevented by the injury or by illness arising from doing such duty, from attending to their usual occupation or calling; and

---

(continued)
raised on appeal go to the jurisdiction of the trial court or concern matters of great public interest.'"  Nieder v. Royal Indem. Ins. Co., 62 N.J. 229, 234 (1973) (internal quotation marks and citation omitted).  However, we note that Executive Order 26 (McGreevey), issued pursuant to N.J.S.A. 47:1A-1, exempts from disclosure under OPRA "[i]nformation describing a natural person's finances, income, assets, liabilities, net worth, bank balances, financial history or activities, or creditworthiness, except as otherwise required by law to be disclosed."  Ibid.  The Order also exempts "information related to medical, psychiatric or psychological history, diagnosis, treatment or evaluation . . . ."  Ibid.

(3) the families of any persons doing public fire duty who die as the result of an act of terrorism committed against the United States of America while such persons were serving as federal, State or local law enforcement officers.

[N.J.S.A. 43:17-3.]

The Association "shall have the same rights, powers and privileges as the local firemen's relief associations, including providing for the distribution of any fund for the relief of disabled or needy firefighters and their families." N.J.S.A. 43:17-41.

Awards of relief shall be made pursuant to rules and regulations adopted by the Association. N.J.S.A. 43:17-3(c) ("The relief, support or burial benefit shall be granted in accordance with the rules and regulations adopted by the New Jersey State Firemen's Association."); see also N.J.S.A. 43:17-24, -35. However, the Association's rules and regulations have not been promulgated with notice and allowing comment. See N.J. Const., Art. V, § 4, para. 6; N.J.S.A. 52:14B-4.

The statute also authorizes consideration of why a person is in need.

No person shall be given assistance if the cause of the need or the reason for the disability or the nature or cause of the injury or sickness is not in the opinion of the board of representatives such as to entitle the applicant to assistance, or if

the applicant is deemed financially unworthy of assistance.

[N.J.S.A. 43:17-24.]

The Department of Banking and Insurance (DOBI) requires local relief associations to file annual reports including the names of relief beneficiaries and the amounts paid.[11] The applicable regulations provide:

(a) All local relief associations shall file with the Commissioner, the Secretary of State, and the secretary of the State Association, no later than April 1 of each year, a sworn statement, which shall contain the following information:

1. The names of its representatives, visitors or trustees and other officers, with the amount of their respective fees or salaries, if any;

2. The names of its beneficiaries during or within the year next preceding the statement;

3. The amount of money paid to each beneficiary; . . . .

[N.J.A.C. 11:1-38.3.]

The regulations do not expressly require a similar report by the Association, notwithstanding that it has the power, comparable to the local associations, to award relief benefits.

---

[11] The Association and local associations are funded through a tax on fire insurance premiums of insurers not organized under New Jersey law, N.J.S.A. 54:18-1, -2; and fire insurance premiums of surplus lines fire insurers, N.J.S.A. 17:22-6.59.

The issue presented is whether the payment records are shielded by OPRA's "privacy clause," which states: "[A] public agency has a responsibility and an obligation to safeguard from public access a citizen's personal information with which it has been entrusted when disclosure thereof would violate the citizen's reasonable expectation of privacy . . . ." N.J.S.A. 47:1A-1.  We have previously determined that the Association is a public agency subject to OPRA.  Paff, supra, 431 N.J. Super. at 279.  Also, it is undisputed that relief payment records are government records.  N.J.S.A. 47:1A-1.1.  Although numerous categories of documents are exempt from the definition of government records, see Educ. Law Ctr., supra, 198 N.J. at 284 ("OPRA excludes twenty-one categories of information, making the public right of access not absolute.") (citation omitted), none of the exemptions apply here.  Furthermore, the Association does not invoke any regulation or executive order that arguably removes the payment records from the scope of its disclosure obligations under OPRA.[12]

---

[12] In particular, we note that an agency may exempt certain documents by regulation authorized by law.  N.J.S.A. 47:1A-1 (stating that public agencies may exempt documents from disclosure by "regulation promulgated under the authority of any statute or Executive Order of the Governor").  The exemption power is not "unlimited" and must "be exercised only when
(continued)

The privacy clause is a substantive counterweight to the right to access under OPRA. Burnett v. Cty. of Bergen, 198 N.J. 408, 422-23 (2009). Courts must balance OPRA's mandate of disclosure with its protection of privacy. Id. at 425-26. To do so, the Court determined it was appropriate to consider the seven factors identified in Doe, supra:

> (1) the type of record requested; (2) the information it does or might contain; (3) the potential for harm in any subsequent nonconsensual disclosure; (4) the injury from disclosure to the relationship in which the record was generated; (5) the adequacy of safeguards to prevent unauthorized disclosure; (6) the degree of need for access; and (7) whether there is an express statutory mandate, articulated public policy, or other recognized public interest militating toward access.
>
> [Id. at 427 (quoting Doe, supra, 142 N.J. at 88).]

---

(continued)
necessary for the protection of the public interest." Irval Realty, Inc. v. Bd. of Public Util. Commrs., 61 N.J. 366, 374 (1972) (applying identical language in pre-OPRA Right to Know Law). We express no opinion as to whether the Association, pursuant to its power to adopt rules or regulations governing the grant of relief, may exempt documents from OPRA. The regulations are not before us, and have not been adopted pursuant to public notice and comment under the Administrative Procedure Act (APA), N.J.S.A. 52:14B-4; nor are they available for public viewing in accord with the APA. N.J.S.A. 52:14B-3(3).

A court must engage in a case-specific analysis. Id. at 437 ("This balancing of interests must be applied case by case, and under different facts, another result might be proper.").

Although the trial court applied the Doe factors, we consider them de novo. See K.L. v. Evesham Twp. Bd. of Educ., 423 N.J. Super. 337, 349 (App. Div. 2011) (stating that an appellate court exercises de novo review of a trial court decision regarding whether OPRA requires disclosure of publicly held records), certif. denied, 210 N.J. 108 (2012). In so doing, we part company with the trial court, given its determination that the privacy clause shields relief payment records.

We consider together the first two factors — the record type and information contained. Carter seeks copies of checks, which would confirm the identity of a relief applicant, state the amounts of relief received, and state when they were received from a public agency empowered to make discretionary relief decisions. However, if Carter is able to confirm that Doe received relief, additional information may be inferred; even without his application documents, Carter may infer that Doe was in financial distress, although cause and extent were not disclosed.

Personal financial information in the possession of public agencies — which is what Carter seeks — has not been treated uniformly under OPRA and implementing regulations and executive orders. OPRA exempts "the pension or personnel records of any individual in the possession of a public agency" from the definition of government records, but does not exempt a public employee's "name, title, position, salary, payroll record,[13] length of service, date of separation and the reason therefor, and the amount and type of any pension received." N.J.S.A. 47:1A-10. Also, Executive Order No. 26 (McGreevey), ¶ 4(b)(3) (2002) exempts "[i]nformation describing a natural person's finances, income, assets, liabilities, net worth, bank balances, financial history or activities, or creditworthiness, except as otherwise required by law to be disclosed."[14]

_____

[13] Although "payroll record" is not defined in OPRA, it elsewhere has been defined to include more than salary. For example, to comply with The Unemployment Compensation Law, N.J.S.A. 43:21-1 to -24, and the Temporary Disability Benefits Law, N.J.S.A. 43:21-25 to -71, among others, employers must maintain "payroll records" that include: "[t]otal remuneration paid in each pay period showing separately cash, including commissions and bonuses . . . gratuities received regularly . . . [and] special payments, such as bonuses and gifts . . . ." N.J.A.C. 12:2 Appx. A; see also N.J.A.C. 12:16-2.1.

[14] Also exempt is "[i]nformation relating to medical, psychiatric or psychological history, diagnosis, treatment or evaluation." Id. at ¶ 4(b)(1).

None of these sources directly address Association relief payments, although both parties seek support from N.J.S.A. 47:1-10. The payments are not salary or remuneration for employment, although they are a benefit for qualified firefighters — including, notably, volunteer firefighters — in return for service. Relief payments are discretionary, like bonuses and gifts that are reported on payroll records, but relief recipients are not on the Association's payroll. The Association argues the payments should be withheld as a "pension record" exempt under N.J.S.A. 47:1A-10, and Carter argues the payments should be disclosed as "the amount and type of any pension received," which are not exempt under N.J.S.A. 47:1A-10. In our view, neither interpretation is correct.

Although one might argue that a relief award is "information describing a natural person's . . . income" under Executive Order No. 26,[15] the Order was apparently intended to address personal financial information that a citizen entrusts to the government. See Executive Order No. 21 (McGreevey) ¶ 4 (which Executive Order No. 26 was intended to clarify). It was not intended to bar release of records pertaining to outlays by a public agency to a citizen. Further, any ambiguity in the Executive Order should be resolved in favor of disclosure. See

---

[15] We note that the Association has not presented this argument.

N.J.S.A. 47:1A-1 ("[L]imitations on the right of access accorded by [OPRA] . . . shall be construed in favor of the public's right of access.").

Although the relief payments do not fall neatly into the statutory categories found in N.J.S.A. 47:1-10, their similarity to forms of payment that are subject to disclosure arguably strengthens the case for access. However, there is an important difference between relief awards and salary, pension payments, or even bonuses and gifts reported in payroll records. Bonuses are awarded generally for a job well done — which is unlikely to embarrass the recipient. Relief benefits are awarded upon proof that someone is in financial distress, which may subject the recipient to embarrassment. A similar distinction can be drawn between disability insurance payments, which the GRC has found to be disclosable, see, e.g., Gordon v. City of Orange, GRC Complaint No. 2013-255 (2014), and relief benefits. We conclude factors one and two weigh slightly in favor of non-disclosure based on this distinction between relief awards and other forms of remuneration or compensation that are subject to disclosure under N.J.S.A. 47:1A-10.

Doe factors three and four relate to the potential for harm. The Association's vice president asserts that John Doe, and other beneficiaries whose records would be released, will

suffer public embarrassment. The Association also speculates that future applicants for relief would be deterred from seeking benefits to avoid public embarrassment.[16] We note that release would also arguably have the effect of upsetting the reasonable expectations of applicants, inasmuch as the application forms state that the "Association is required to protect the confidentiality of information." While that may be read to refer only to an applicant's submission, it would be reasonable for an applicant to expect that any benefits received would also be confidential. Upsetting these expectations may affect "the relationship in which the record was generated." On the other hand, disclosure may empower Association members to assess the Association's process for deciding such applications, thereby ultimately enhancing their relationship with the organization. We conclude factors three and four slightly favor non-disclosure.

Factor five refers to "the adequacy of safeguards to prevent unauthorized disclosure." This concerns the extent to which the requested documents are otherwise protected from disclosure. The Association's vice president asserted that

---

[16] The Association also discusses the harm that would result from the release of the personal financial information included in the applications. As noted, we deem Carter's request for that information to have been abandoned in the trial court.

consideration of applications is performed without attaching the applicant's name, to assure unbiased consideration. On the other hand, Carter maintained that existing safeguards were inadequate, because he learned through some unnamed source that Doe had received benefits. Given the apparent leak, this factor neither favors nor disfavors disclosure.

It is also reasonable to discuss factors six and seven together. Carter's need for access is based on an interest in the Association's exercise of its authority to grant relief in Doe's case. Carter questions whether it is appropriate to award benefits to a person who was charged with crimes and allegedly terminated for conduct related to those charges. We need not take a position on whether the circumstances of Doe's termination should be a factor in the Association's decision-making to conclude that Carter's expressed interest relates to the Association's governance. For example, Carter does not seek disclosure for financial gain, as a finance company might, in seeking the names of beneficiaries because they are in financial distress and may be worth soliciting. Carter's request is instead grounded in an interest in the Association's authority to grant Doe a relief award given the allegations of impropriety that led to Doe's termination from public employment.

We noted above that the statute authorizes consideration of the cause of a person's financial need. N.J.S.A. 43:17-24. The relief decisions must be made according to the Association's rules and regulations. N.J.S.A. 43:17-3(c). However, the lack of transparency in the Association's decision-making process, including the lack of publicly available rules and regulations adopted after notice and comment, heightens the need for disclosure of documents related to individual cases. Cf. Mason, supra, 196 N.J. at 64 (stating that OPRA is designed "to maximize public knowledge about public affairs in order to ensure an informed citizenry and to minimize the evils inherent in a secluded process.") (internal quotation marks and citation omitted). The need for disclosure is also heightened by the fact that, apparently, only local relief associations' beneficiaries and amounts of grants are subject to DOBI's outside review. N.J.A.C. 11:1-38.3. We conclude that factors six and seven weigh heavily in favor of disclosure.

Upon balancing the Doe factors, in view of the circumstances presented in this case, we conclude that the privacy clause does not bar plaintiff's right under OPRA to the records of the relief payments made to Doe.

We briefly address the Association's contention that a contrary result is compelled by Michelson v. Watt, 379 N.J.

Super. 611 (App. Div. 2005). We disagree. In Michelson, supra, plaintiff sought disclosure of documents and information pertaining to the health insurance benefits enjoyed by public employees of the city in which he lived. Id. at 614. The court held that plaintiff's request was "not subject to access and disclosure pursuant to OPRA." Id. at 623. The court deemed the detailed health insurance information requested to be personnel records that fell outside of government records as defined in N.J.S.A. 47:1A-10. Also, disclosure was barred by Executive Order No. 26, which established that "information regarding an individual's health history is not a government record subject to public access." Id. at 619-20; Executive Order No. 26 (McGreevey), ¶ 4(b)(1) (2002). Finally, disclosure was barred by N.J.A.C. 17:9-1.2(b), which "treats all personal health information as confidential information in accordance with HIPAA." Michelson, supra, 379 N.J. Super. at 620.

Michelson does not compel non-disclosure in this case. Relief payments are not personnel records under N.J.S.A. 47:1A-10. Furthermore, disclosure is not shielded by Executive Order No. 26 or any duly adopted regulation.

In sum, plaintiff is entitled to the limited disclosure of Doe's relief payment checks under OPRA.

We also conclude that Carter is entitled to Doe's payment records under the common law right of access. See Mason, supra, 196 N.J. at 67 (noting that OPRA does not limit the common law right of access) (citing N.J.S.A. 47:1A-8). There is no question that Carter seeks a public record, subject to the common law right of access. See Nero v. Hyland, 76 N.J. 213, 222 (1978) ("The elements essential to constitute a public record are . . . that it be a written memorial, that it be made by a public officer, and that the officer be authorized by law to make it.") (internal quotation marks and citation omitted). There also is no question that Carter has standing; he is an Association member interested in the criteria applied to relief decisions. See Irval, supra, 61 N.J. at 372 (stating that some showing of interest is required to enforce the common law right to inspect).

An access request under the common law is subject to an "exquisite weighing process" that balances the requestor's interest in disclosure and the government's interest in confidentiality. Loigman v. Kimmelman, 102 N.J. 98, 108 (1986). The balancing process must be "concretely focused upon the relative interests of the parties in relation to the specific materials in question." Piniero v. N.J. Div. of State Police,

404 <u>N.J. Super.</u> 194, 206-07 (App. Div. 2008) (citing <u>McClain v.</u>

<u>Coll. Hosp.</u>, 99 <u>N.J.</u> 346, 361 (1985)).  The Court has identified

several factors that may be considered:

> (1) the extent to which disclosure will impede agency functions by discouraging citizens from providing information to the government; (2) the effect disclosure may have upon persons who have given such information, and whether they did so in reliance that their identities would not be disclosed; (3) the extent to which agency self-evaluation, program improvement, or other decisionmaking will be chilled by disclosure; (4) the degree to which the information sought includes factual data as opposed to evaluative reports of policymakers; (5) whether any findings of public misconduct have been insufficiently corrected by remedial measures instituted by the investigative agency; and (6) whether any agency disciplinary or investigatory proceedings have arisen that may circumscribe the individual's asserted need for the materials.  Against these and any other relevant factors should be balanced the importance of the information sought to the plaintiff's vindication of the public interest.
>
> [<u>Loigman</u>, <u>supra</u>, 102 <u>N.J.</u> at 113 (citation omitted).]

The requestor's motivation is also a relevant consideration.

<u>Loigman</u>, <u>supra</u>, 102 <u>N.J.</u> at 104 ("Somewhat different but related

considerations arise when the citizen seeks access to

information to further a public good" as opposed to a private

interest.).

A-2810-13T2

*Loigman* factors one and two slightly favor confidentiality. As discussed above, the Association contends disclosure of Doe's records may discourage members from applying for benefits in the future; however, this fear is speculative. In any event, Carter's request is confined to a single recipient, limiting any chilling effect of disclosure. However, as noted above, an applicant may reasonably have relied on the reference to confidentiality in the application form.

Turning to factor three, we discern no threat that disclosure would chill the ability of the Association or local associations to render their decisions, or to engage in self-evaluation and improvement. If anything, disclosure may encourage self-criticism and internal oversight. Carter seeks factual data, not evaluative reports (factor four). Moreover, there is no evidence that alternative remedial measures or outside oversight have addressed the issue of concern to Carter — that is, whether benefits are granted to persons whose financial distress is allegedly the result of their misconduct.

As *Loigman* provides, other relevant factors may be considered. In this case, weight may be given to the fact that Doe has already been placed in the public eye. His arrest and his termination received publicity in the local newspapers. Thus, to some extent, his personal travails are already in the

A-2810-13T2

public domain. What is not disclosed is whether he has received assistance from a local association or the Association. This distinguishes Carter's request from a request for payments made to any and all beneficiaries.

Carter's professed need is not based on personal curiosity, or personal financial interest. Rather, it is based on his interest in determining the criteria for relief awards, specifically, whether the local association or Association deems it appropriate to consider the cause of a person's financial need. The lack of transparency in the Association's decision-making, the lack of rules adopted pursuant to the APA, and the lack of oversight by DOBI of Association awards, heightens the interest in disclosure.

In sum, we conclude that the public interest in disclosure in this case outweighs the interest in confidentiality.

V.

We briefly address the Association's argument that Carter's counterclaim for disclosure was time-barred, as it was filed more than forty-five days after the denial. OPRA actions have a forty-five-day statute of limitations, as do actions in lieu of prerogative writs. Mason, supra, 196 N.J. at 57. However, that time frame may be enlarged "in the interest of justice." Id. at 70. The time period should be enlarged here because the

Association's declaratory judgment action effectively preempted Carter's option to resort to the GRC, which has no specified limitations period. <u>Id.</u> at 70. Carter was compelled to respond to a lawsuit that, as discussed above, the Association was not entitled to bring in the first place.

We also note that because Carter has prevailed, in that he has secured access to Doe's relief payment records, he is entitled to a reasonable attorney's fee. <u>N.J.S.A.</u> 47:1A-6. We remand for the trial court's fee determination.

Reversed and remanded. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2810-13T2

**MESSANO, P.J.A.D, concurring.**

For the reasons compellingly presented by Judge Ostrer in Parts III and IV of his opinion, I agree that Carter was entitled to obtain copies of the relief payments made by the Association to John Doe under both OPRA and the common law right of access to public records. I further agree with the conclusions that OPRA "grants a right of action exclusively to requestors," and that "the Legislature did not intend for records custodians to bring actions against record requestors to enforce their asserted right to withhold records." Ante at 22, 24.

I also agree that the Legislature did not intend to permit any "public agency," like the Association, to commence an action under OPRA seeking to pre-emptively establish <u>a defense that is expressly provided by the statute</u>. See N.J.S.A. 47:1A-5(g) (permitting the custodian of a government record to "assert[] that part of a particular record is exempt from public access"). Finally, I agree that permitting a public agency to initiate a lawsuit asserting a defense to the production of particular public records under the common law would result in "fragmentary redress," <u>ante</u> at 27, and should be avoided in furtherance of the salutary goal of judicial economy.

I write separately, however, to state my respectful disagreement with my colleagues' expansive conclusion in Part II-A of their opinion that "if there is no private right of action under a particular statute, a party may not secure a declaration of its statutory rights by seeking relief under the DJA." Ante at 17. In my opinion, that conclusion is not supported by the clear and unambiguous language of the DJA, which is the clearest indication of the Legislature's intent. Town of Kearny v. Brandt, 214 N.J. 76, 98 (2013).

As noted by my colleagues, the DJA is remedial in nature and entitled to liberal interpretation. Ante at 14-15. The DJA provides that "[a]ll courts of record . . . shall . . . have power to declare rights, status and other legal relations, whether or not further relief is or could be claimed." N.J.S.A. 2A:16-52 (emphasis added). Seemingly, the Legislature did not intend to foreclose a party from seeking relief under the DJA even if "further relief" could not be claimed by that party. Id.

N.J.S.A. 2A:16-53, in turn, provides that "[a] person . . . whose rights, status or other legal relations are affected by a statute, . . . may have determined any question of construction or validity arising under the . . . statute . . . and obtain a declaration of rights, status or other legal relations

thereunder." (Emphasis added). As noted, I agree that a public agency cannot initiate a lawsuit under OPRA to determine whether a specific record is exempt from production under OPRA. In my mind, the highly discretionary remedy of declaratory relief cannot be invoked to settle such a dispute, because that issue has little to do with the "rights, status or other legal relation[]" of and between, in this case, the Association and Carter.

However, the Association is undoubtedly a person "whose rights, status and other legal relations are affected" by OPRA. N.J.S.A. 2A:16-53 (emphasis added). In a different context, I believe the Association could initiate a lawsuit seeking relief under the DJA. For example, in Paff, supra, 431 N.J. Super. at 285, the trial court dismissed the plaintiff's complaint, finding the Association was not a public agency subject to OPRA. After thoroughly reviewing the Association's "formation, structure, and function," we concluded that it was a public agency under OPRA and reversed. Id. at 289-90.

In Paff, the issue arose in the context of an OPRA suit already initiated by a "requestor." Given the Association's unusual status, however, I doubt that we would have dismissed an action initiated by the Association pursuant to the DJA seeking a declaration as to whether or not it was public agency. Even

though OPRA provides no right of action to a public agency, I believe the Association's complaint in that context — whether the association was subject to OPRA — would have been cognizable under the DJA.[1]

I find support for this conclusion not only through application of the plain language of the DJA, but also in cases that have long-recognized the appropriateness of such relief under the DJA. See, e.g., N.J. Ass'n for Retarded Citizens, supra, 89 N.J. at 242 (resort to the DJA is appropriate "to end uncertainty about the legal rights and duties of the parties . . . in controversies which have not yet reached the stage at which the parties seek a coercive remedy," and where "there is an actual controversy . . . which involves differing views on the meaning of applicable statutory provisions").[2]

---

[1] In Paff, we cited three other cases that involved public agencies that, given their unusual circumstances, challenged whether they were subject to OPRA. Id. at 287 (citing Sussex Commons Assocs., LLC v. Rutgers, the State Univ., 210 N.J. 531 (2012); Fair Share Hous. Ctr., Inc. v. N.J. State League of Municipalities, 207 N.J. 489 (2011); The Times of Trenton Publ'g Corp. v. Lafayette Yard Cmty. Dev. Corp., 183 N.J. 519 (2005)). Although in those cases the issue arose in the context of a pending prerogative writ lawsuit brought by a requestor, I believe the Court would have resolved the issue had the public agency initiated the suit for declaratory relief.

[2] I recognize that there must be an "actual controversy" before the DJA can be invoked. Finkel v. Twp. of Hopewell, 434 N.J. Super. 303, 318 (App. Div. 2013). However, that predicate could
(continued)

In this regard, while the out-of-state and federal cases cited by my colleagues provide support for their conclusion — "if there is no private right of action under a particular statute, a party may not secure a declaration of its statutory rights" — I do not believe any of the cited New Jersey cases do. Moreover, it strikes me as anomalous that a statute like OPRA that provides a specific unilateral cause of action to a requestor could nonetheless provide the rationale for barring a clearly "affected" party — here, the Association — from seeking relief under the DJA.

Moreover, our courts have considered requests for declaratory relief under the DJA even though the particular statute at issue provided no right of action to a litigant. For example, in <u>Chamber of Commerce v. State</u>, 89 <u>N.J.</u> 131, 138-39 (1982), the Court considered whether the plaintiff trade association was entitled to relief under the DJA declaring the <u>Strikebreakers Act</u>, <u>N.J.S.A.</u> 34:13C-1 to -6, unconstitutional. The Court ultimately concluded that portions of the statute were preempted by federal labor law, but other sections were not. <u>Id.</u> at 163. The Court did not predicate the relief upon the plaintiff, or for that matter, any person, having a private

_____

(continued)
be easily satisfied, for example, if a request has been made, but the litigation has not commenced, as was the case here.

right of action under the Strikebreakers Act.  Indeed, the statute was essentially penal in nature, and presumably could not be invoked by anyone other than the State.  See N.J.S.A. 34:13C-5 (making any violation of the act a misdemeanor).

In NL Indus., Inc. v. New Jersey Dept. of Envtl. Protection, 397 N.J. Super. 127, 133 (App. Div. 2007), certif. denied, 195 N.J. 418 (2008), we considered the "rights and responsibilities" of the parties under N.J.S.A. 58:10B-3.1, which permitted a local government unit that condemned property to replace — with the Department's approval — a person performing remediation at the contaminated site.  Before considering the merits, we concluded that the plaintiff's complaint was cognizable under the DJA, specifically rejecting the Department's argument that jurisdiction lay in the Appellate Division and not the trial court.  Id. at 131-32.  Notably, neither the statute at issue, nor the legislation of which it was a part, provided the remediating party with a specific cause of action by which to challenge the Department's or the public entity's decision.

Finally, although I agree with much of my colleagues' opinion, I believe it unnecessary to paint with such a broad brush.  Whether the DJA means what it says, or, whether its remedies are available only to those whom the Legislature has

provided a specific cause of action, is an issue of some import. Resolving that issue in a manner that I believe departs from existing precedent is more appropriately the province of our Supreme Court. See, e.g., Riley v. Keenan, 406 N.J. Super. 281, 297 (App. Div.) (noting that an appellate court "should normally defer to the Supreme Court with respect to the creation of a new cause of action") (citing Tynan v. Curzi, 332 N.J. Super. 267, 277 (App. Div. 2000)), certif. denied, 200 N.J. 207 (2009); Proske v. St. Barnabas Med. Ctr., 313 N.J. Super. 311, 316 (App. Div. 1998) (declining to find damages for personal injuries based on a failure to perform a contractual term "'in the absence of [any] precedent, or . . . clear direction by dictum from our Supreme Court'" authorizing such action) (quoting Coyle v. Englander's, 199 N.J. Super. 212, 226 (App. Div. 1985)), certif. denied, 158 N.J. 685 (1999).

I therefore respectfully concur in the judgment.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION